SMS/JSF/2017R00221

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Kevin McNulty |
| | : | |
| v. | : | Criminal No. 20-826 |
| | : | |
| ANDREW MCCUBBINS | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. § 1349 |

## I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States, acting under authority conferred by 28 U.S.C. § 515, for the District of New Jersey charges:

### COUNT ONE
### (Conspiracy to Violate the Anti-Kickback Statute)

1. Unless otherwise indicated, at all times relevant to this Information:

### The Defendant and Other Individuals and Entities

    a.    Defendant ANDREW MCCUBBINS ("defendant MCCUBBINS") was a resident of Draper, Utah. Defendant MCCUBBINS and other individuals owned and operated a telemedicine company based in Utah (the "Telemedicine Company"). Among other things, the Telemedicine Company ostensibly provided certain health care services, through health care professionals that it contracted with, to individuals who received benefits under the Medicare Program ("Medicare"), who were typically referred to as "beneficiaries." Defendant MCCUBBINS and others paid

kickbacks and bribes to various parties in exchange for referrals and orders for genetic cancer screening tests ("CGX Tests") for beneficiaries.

b. Nurse Practitioner-1 and Nurse Practitioner-2 were nurse practitioners located in Oklahoma and Arkansas, respectively, that the Telemedicine Company bribed in exchange for orders for CGX Tests.

c. Physician-1 was a medical doctor located in Arkansas that the Telemedicine Company bribed in exchange for orders for CGX Tests.

### Overview of the Scheme

d. As described more fully below, certain call centers that did business with defendant MCCUBBINS and others targeted Medicare beneficiaries for whom Medicare would pay for CGX Tests (collectively, the "Suppliers"). Defendant MCCUBBINS and others offered and paid kickbacks and bribes to individuals operating the Suppliers in exchange for CGX Test referrals for beneficiaries located in New Jersey and elsewhere. Once the Telemedicine Company received the referrals, health care professionals acting on its behalf wrote medically unnecessary orders for CGX Tests for the beneficiaries.

e. Specifically, defendant MCCUBBINS—through the Telemedicine Company—bribed medical doctors, nurse practitioners, and physician assistants (collectively, "Prescribers"), including Nurse Practitioner-1 and Nurse Practitioner-2, to prescribe CGX Tests for Medicare beneficiaries.

f. In addition, the health care professionals who ordered the CGX Tests did so without ever performing a legitimate consultation or serving as the

2

beneficiaries' treating provider. Instead, prescribers performed cursory patient "consults" via telephone and without the benefit of any audio-visual interaction with the beneficiaries as required under Medicare's telemedicine rules. As a result, the Prescribers wrote medically unnecessary prescriptions for CGX Tests.

g. The Telemedicine Company also bribed medical doctors, including Physician-1, to purportedly "supervise" the Prescribers (collectively, the "Supervisors"). In order for the Prescribers to write prescriptions, the Telemedicine Company had to ensure that they were doing so under the supervision of a doctor. The Telemedicine Company bribed the Supervisors in exchange for allowing the Telemedicine Company to use their names, licenses, and Medicare provider numbers to legitimize the Prescribers' prescriptions for CGX Tests. The Supervisors, however, failed to perform the requisite supervision of and collaboration with the Prescribers that was necessary for the Prescribers to issue prescriptions.

### Background on the Medicare Program and Genetic Testing

h. Medicare was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "health care program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). The Medicare Part B program was a federally funded supplemental insurance program that provided Medicare insurance benefits for individuals aged 65 or older, and for certain

individuals who were disabled. The Medicare Part B program paid for various medical services for beneficiaries, including CGX Tests.

i. Genetic tests were laboratory tests designed to identify specific inherited mutations in a patient's genes. These genetic variations affected a patient's risk of developing certain diseases or how the patient responded to medications. CGX Tests were genetic tests related to a patient's hereditary predisposition for cancer.

j. To conduct a genetic test, a laboratory must obtain a DNA sample from the patient. Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The DNA sample was then submitted to the laboratory for analysis, such as CGX Tests.

k. If the patient had insurance, the laboratory would typically submit a claim for reimbursement for the test to the patient's insurance carrier. Reimbursement rates for CGX Tests sometimes exceeded approximately $8,000 per test.

l. Medicare excluded from coverage diagnostic genetic tests "that are not reasonable and necessary . . . [f]or the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1). To be considered "reasonable and necessary," Medicare rules required that genetic testing "be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's

specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

    m.    Non-physician practitioners, such as clinical nurse specialists or physician assistants, may also order genetic tests but were subject to the same requirement as physicians: they must consult or treat the beneficiary for a specific medical problem and use the test results to manage the beneficiary's specific medical problem. 42 C.F.R. § 410.32(a)(2).

    n.    In most states, non-physician practitioners are only authorized to write prescriptions under the supervision of a physician or medical doctor. The requirements of state-mandated supervision of non-physician practitioners vary, but nearly every state requires a non-physician practitioner and his or her supervising physician to engage in some form of meaningful clinical collaboration. Medicare requires that non-physician practitioners comply with the state-mandated supervision requirements. 42 C.F.R. § 410.74(a)(2).

### Telemedicine

    o.    Telemedicine allows health care providers to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as the internet or telephone to interact with a patient.

    p.    Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements

5

were met. These requirements included, among others: (a) that the beneficiary was located in a rural area (outside a metropolitan area or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

q.  Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

## The Conspiracy

2.  From at least as early as in or about October 2018 through in or about July 2019, in the District of New Jersey, and elsewhere, defendant

**ANDREW MCCUBBINS**

did knowingly and intentionally conspire and agree with others to commit certain offenses against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service, and to order or arrange for or recommend ordering of any item or service, for which payment may be made in whole or in part under a Federal health care program,

6

namely Medicare, contrary to Title 42, United States Code, Sections 1320a-7b(b)(2)(A), (B).

## Goal of the Conspiracy

3. The goal of the conspiracy was for defendant MCCUBBINS and his co-conspirators to unlawfully enrich themselves by paying kickbacks and bribes to health care providers and others to cause medically unnecessary CGX Tests that resulted in Medicare payments to MCCUBBINS and his co-conspirators.

## Manner and Means of the Conspiracy

4. The manner and means by which defendant MCCUBBINS and others sought to accomplish the goal of the conspiracy included, among other things, the following:

    a. Defendant MCCUBBINS and others entered into kickback agreements with individuals who operated the Suppliers that targeted Medicare beneficiaries for CGX Tests. Under these agreements, defendant MCCUBBINS and others paid kickbacks to the Suppliers for each Medicare beneficiary the Suppliers referred to defendant MCCUBBINS and others and who ultimately received CGX Tests from a clinical laboratory that Medicare had reimbursed for the tests.

    b. After the Suppliers referred Medicare beneficiaries for CGX Tests to defendant MCCUBBINS and others, the Telemedicine Company generated medically unnecessary prescriptions for CGX Tests.

7

c. In order to induce Prescribers to write medically unnecessary prescriptions for CGX Tests, the Telemedicine Company typically paid Prescribers approximately $20 for each CGX Test a Prescriber ordered.

d. In order to induce Supervisors to allow their credentials to be used to legitimize the prescriptions that the Prescribers issued, and to appear to be practicing in compliance with state-mandated supervision requirements, the Telemedicine Company bribed some Supervisors approximately $2 for each CGX Test ordered by a Prescriber that the Supervisor purported to supervise. In most instances, the Supervisors had no legitimate clinical or collaborative relationship with the Prescribers they purportedly supervised.

e. To conceal the payments of bribes in exchange for prescriptions for CGX Tests, the Telemedicine Company and some individual Prescribers and Supervisors entered into sham consulting contracts. According to the sham agreements, the Prescribers and Supervisors were to be paid "per consultation," not per-prescription. In reality, however, the Prescribers and Supervisors were paid on a per-prescription basis, regardless of whether or not they performed a consultation.

f. After the Telemedicine Company generated the prescriptions for the medically unnecessary CGX Tests, a clinical laboratory performed the CGX Tests and submitted corresponding claims to Medicare for the tests.

g. As a result of defendant MCCUBBINS' participation in the kickback and bribery scheme, from at least as early as in or about October 2018 through in or about July 2019, Medicare paid approximately at least $89,137,434 for

8

CGX Test claims that were the product of the illicit scheme. Defendant MCCUBBINS benefitted from these Medicare reimbursements.

### Overt Acts

5. In furtherance of the conspiracy, and in order to effect the goal thereof, defendant MCCUBBINS and others committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

   a. On or about March 27, 2019, a co-conspirator caused a health care company associated with defendant MCCUBBINS to wire kickback payments of approximately $106,400 to one of the Suppliers.

   b. On or about January 4, 2019, defendant MCCUBBINS, through the Telemedicine Company, wired a bribe payment of approximately $20 to Nurse Practitioner-1. The payment was for a CGX Test prescription written for a Medicare beneficiary, the cost of which was reimbursed by Medicare.

   c. On or about January 11, 2019, defendant MCCUBBINS, through the Telemedicine Company, wired a bribe payment of approximately $20 to Nurse Practitioner-2. The payment was for a CGX Test prescription written for a Medicare beneficiary, the cost of which was reimbursed by Medicare.

   d. On or about January 11, 2019, defendant MCCUBBINS, through the Telemedicine Company, wired a bribe payment that included a payment of approximately $2 to Physician-1. The payment was for a CGX Test prescription for a

Medicare beneficiary written by Nurse Practitioner-2, who Physician-1 was purporting to supervise, the cost of which was reimbursed by Medicare.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
## (Conspiracy to Commit Health Care Fraud)

6. The allegations in Paragraphs 1 and 3 through 5 of Count One are realleged here.

7. From at least as early as in or about October 2018 through in or about July 2019, in the District of New Jersey, and elsewhere, defendant

## ANDREW MCCUBBINS

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

8. The goal of the conspiracy was for defendant MCCUBBINS and others to unlawfully enrich themselves by submitting or causing the submission of false and fraudulent claims to Medicare.

### Manner and Means

9. The manner and means by which defendant MCCUBBINS and others sought to accomplish the goal of the conspiracy included, among other things, the following:

11

a. After the Telemedicine Company received the CGX referrals in the manner described above, the Prescribers contacted the beneficiaries. In general, the Prescribers did not treat or examine the beneficiaries for any symptoms or conditions, but instead only sought to generate orders for CGX Tests for the beneficiaries without regard to medical necessity. Nor did the Prescribers comply with Medicare's telemedicine requirements when ordering the CGX Tests.

b. Similarly, the Supervisors did not comply with state-mandated supervision requirements and, in general, did not have any legitimate relationship with the Prescribers they purported to supervise.

c. After the Prescribers generated orders for CGX Tests, the Telemedicine Company provided the orders to a laboratory, which then submitted or caused to be submitted claims to Medicare for payment for each CGX Test.

d. Defendant MCCUBBINS and others knowingly provided the laboratory with orders for CGX Tests in furtherance of the fraudulent submissions to Medicare.

All in violation of Title 18, United States Code, Section 1349.

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

10. The allegations in Paragraphs 1, 3 through 5, and 8 through 9 of Counts One and Two are realleged here.

11. From at least as early as in or about October 2018 through in or about July 2019, in the District of New Jersey, and elsewhere, defendant

**ANDREW MCCUBBINS**

did knowingly and intentionally conspire and agree with others to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

### Goal of the Conspiracy

12. The goal of the conspiracy was for defendant MCCUBBINS and others to unlawfully enrich themselves by submitting or causing the submission of false and fraudulent claims to Medicare.

### Manner and Means

13. The manner and means by which defendant MCCUBBINS and others sought to accomplish the goal of the conspiracy included, among other things, the following:

13

a. As provided in Paragraph 9(a), the Prescribers wrote medically unnecessary orders for CGX Tests and failed to comply with Medicare's telemedicine requirements.

b. As provided in Paragraph 9(b), the Supervisors had no legitimate relationships with the Prescribers they purported to supervise in order to comply with mandatory state supervision requirements.

c. As provided in Paragraph 5, defendant MCCUBBINS and others transmitted kickback and bribe payments in interstate commerce in furtherance of the fraud scheme.

d. As provided in Paragraphs 9(c) and (d), defendant MCCUBBINS and others knowingly caused the submission of fraudulent claims to Medicare for medically unnecessary CGX Tests.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

14. Upon conviction of the offenses alleged in Counts One and Two of this Information, defendant MCCUBBINS shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offense (as defined in 18 U.S.C. § 24) alleged in this Information.

15. Upon conviction of the offense alleged in Count Three of this Information, defendants MCCUBBINS shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such conspiracy offense, and all property traceable to such property.

## SUBSTITUTE ASSETS PROVISION
### (Applicable to All Forfeiture Allegations)

16. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> (a) cannot be located upon the exercise of due diligence;
>
> (b) has been transferred or sold to, or deposited with, a third person;
>
> (c) has been placed beyond the jurisdiction of the Court;
>
> (d) has been substantially diminished in value; or
>
> (e) has been commingled with other property which cannot be subdivided without difficulty;

15

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

                                                */s/ Rachael A. Honig*
                                                RACHAEL A. HONIG
                                                Attorney for the United States,
                                                Acting Under Authority Conferred
                                                By 28 U.S.C. § 515

CASE NUMBER: 20-

United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

ANDREW MCCUBBINS

INFORMATION FOR

18 U.S.C. §§ 371, 1349

RACHAEL A. HONIG
*ATTORNEY FOR THE UNITED STATES*
*ACTING UNDER AUTHORITY CONFERRED*
*BY 28 U.S.C. § 515*
*NEWARK, NEW JERSEY*

Sean M. Sherman
J. Stephen Ferketic
Ryan O'Neill
*ASSISTANT U.S. ATTORNEYS*
*973-645-2733*